### 39540. BROWN v. PORTO.

DECIDED JULY 2, 1962.

*Louis H. Mitchell,* for plaintiff in error.

*Vincent P. McCauley, Marilyn W. Carney,* contra.

FELTON, Chief Judge. The only question in this case is whether the jury was authorized to find that the defendant furnished his daughter with the automobile involved in the collision for her pleasure and convenience so as to bring it into the category of a family-purpose vehicle. We do not think that the evidence authorized such a finding. Touching the question involved, the defendant's daughter Barbara testified: "I was driving the car without my father's knowledge at the time. He had forbidden me to drive the car at all. I had driven it four or five times in 1960, with his permission. I always had to get his permission. One night I stayed out real late and he wouldn't let me use the car after that. He told me I couldn't use it any more. This was about nine or ten months before the accident. At the time of the accident the car wasn't to be driven at all. My father didn't know I was using it on the date of the accident. He had to go to Florida and I drove it without his knowing it. He went to Florida Friday or Saturday and was there when the accident happened, on Tuesday, on business, which was his usual week-end custom. I found the keys to the car in the kitchen cabinet. My father hadn't told me where they were. He had refused me the use of the car for nine months prior to the accident. He told me not to drive it at all under any circumstances." On cross-examination Barbara Brown testified: "I lived on Perry Avenue, in Lincoln Hills, on the day of the accident and I was going to town. I had picked up a girl, Pat Palmer, who lived on 33rd Street. I may have picked her up once or twice before then. I stopped at the intersection of 33rd Street and 9th because you should stop there. I always stop there. It's dangerous there. Daddy has two cars. The one he drove is a Karmann Ghia. He didn't drive the Plymouth at all any more after he got the Karmann Ghia. My mother can't drive a car at all. The way I got the Plymouth that day was that daddy had two sets of keys and I looked until I found the keys which were in the cabinet. I had used the car before when he was gone and had put

the keys back in the cabinet and he would never know I had used it. Daddy refused to let me use the Plymouth car, and had for nine or ten months, even to get my license. Daddy didn't return from Florida until Wednesday or Thursday after the accident. There was a trailer, U-Haul-It, and a cab parked on 9th Avenue, I remember, a Yellow Cab. Most of the time, someone came by and picked me up when I would go from my home to town. My mother runs a store and my father took her to work. When he was out of town she rode a cab. I didn't take my mother to work on the day of the accident, nor were Pat and I heading for her store when the accident occurred." Cecil V. Brown testified: "I am the father of Barbara Brown, who now is Mrs. Barbara Davis. On March 28, 1961, when this accident occurred with Mrs. Porto, my daughter was driving my Plymouth car without my permission or knowledge. The car was in such bad shape until when the motor got warm the oil pressure light would come on. I was scared that the car would tear up, and I had to have transportation to go back and forth to work and take my wife to the store and pick her up, and on February 8, 1961, I bought this Karmann Ghia and transferred the insurance from that Plymouth to the Karmann Ghia and parked that Plymouth, which I mortgaged along with the Karmann Ghia to pay for the Ghia. The Plymouth was not to be used, and had been parked ever since I mortgaged it. The bank had a mortgage on it, that's why it was setting there. I had let my daughter use it before, but that was 9, 10, 11 months before the accident. I refused her permission to use it after that, because she stayed out late one night against my orders. She always had had to get my permission before I would let her use the Plymouth, to even drive to the store for bread. In February, 1961, I started having to go to Florida on Friday night and returned sometimes on Mondays. I was afraid to drive the Plymouth even in town. I left here on Friday night and got back Wednesday, after the accident. For nine months before the accident, my daughter was under direct orders not to use that Plymouth for anything, under any circumstances." On cross-examination he testified: "My wife operates a little bitty grocery store. I remember coming to your office and saying I

was sorry the accident ever took place. I'm sorry any accident ever happens. I never said I was sorry I had bought the car for my daughter. How could I say that? The car was bought for my personal use. . . Nobody's use but mine." Jerry Williamson testified: "My name is Jerry Williamson. I am on the police force in Columbus. The plaintiff in this case is my mother. I went to the scene of the accident, and went to my mother's car there. My mother owns the Buick. I didn't take my mother to receive medical attention. I talked to Barbara Brown, driver of other car. I asked her if she had insurance on the car. She said the car was not hers, her father had bought it and she used the car all the time. That's all she said." Nettie Ray Porto testified in part: "Barbara Brown asked me at the accident if I was hurt and I told her I don't know. She and her girl friend came over to my house that night, and she said her daddy was going to kill her for driving the car and having an accident. She said he had been letting her drive the car since—on her 16th birthday. I don't know how old she was but she said 15 or 16, she had use of the car."

It can readily be seen from the above testimony that there is not one iota of evidence that the car in question was furnished to the daughter at the time of the collision unless at least one of the daughter's statements after the collision could be said to be a part of the res gestae. Even if such deliberative statements could be considered a part of the res gestae, if the time element was satisfied, the two statements made were not so closely connected with the collision as to be considered a part of the res gestae. One was made to a policeman who was called to the scene of the accident. The other was made to the plaintiff at her home on the night following the accident. In addition to these facts the statements of the daughter to the policeman and the plaintiff are not inconsistent with the testimony of the defendant and his daughter to the effect that the car was not a family-purpose car and that, even though the daughter used it, the use was without the defendant's permission. What the situation was ten months prior to the accident has no relevancy. Even if a family-purpose situation existed formerly the evidence demands a finding against any rebuttable presumption that it continued.

230

It seems superfluous to cite decisions explaining the family-purpose car doctrine. Suffice it to say that the doctrine may not be prima facie established by mere proof of ownership in the father (or mother) and proof of the fact that a member of the family operated the vehicle. *Durden v. Maddox,* 73 Ga. App. 491, 493 (37 SE2d 219). The defendant in error contends that the fact that the daughter operated the car without permission does not conflict with the fact of family purpose. Under the facts of the case the contention is not well founded because the evidence demands the finding that at the time of the collision there was no family-purpose car being driven by the defendant's daughter. The facts and rulings in *Evans v. Caldwell,* 184 Ga. 203 (190 SE 582) are not applicable here and the distinction between the facts there and here are too obvious for further comment.

The court erred in overruling the motion for new trial.

*Judgment reversed. Bell and Hall, JJ., concur.*